ORAL ARGUMENT AT 15 MINUTES PER SIDE MR. BUDGET WILL BE AT HALF MR. BUNDA Good morning, your honors. I am pleased to court. My name is Robert Bunda. I represent the appellants and the plaintiffs in the collective action in the court below. Justice Gibbons, I'd like, or Judge Gibbons, I'd like to reserve five minutes. This is a Fair Labor Standards Act case, a collective action case. There are actually two appeals. One was an interlocutory appeal regarding waiver of the right to bring a collective action. The second appeal was for summary judgment. I'd like to reverse the order and discuss the summary judgment first because that would be the more determinative issue. If, in fact, you reverse the summary judgment, then the waiver becomes a factor again. Your honors, similar to the previous argument, this is a case where summary judgment was granted. The trial court essentially determined both the law and the facts in a case that the plaintiffs had requested a jury determination of those facts. The facts really were what are the primary duties that they had with regard to the activities that they had as representatives, stocking shelves in the grocery stores. Did you say that this is a jury issue to be determined? Yes, sir. So you tell the jury what the regulations say and then they decide whether or not to always fit into it. What they determine is what the primary duty was. The regulations say that the primary duty has to be making sales. The jury determines from all the activities that these sales representatives conducted in the grocery stores, the jury determines whether their primary duty was, in fact, making sales or whether it was, in fact, something ancillary to that. And that is something that the court was cited to the Icicle Seafood case, the Supreme Court case. If you look carefully, the kahee, the defendant, asserts that that's a judge call. If you look carefully at that Supreme Court case, in fact, what the Supreme Court was saying was that was a bench trial. The bench trial, the judge made determinations of fact and therefore, thereafter, then the appellate court only looks to the interpretation of the law to determine whether the trial court got it right. That's not this case. We haven't had a chance to present our facts to a jury. And in fact, on summary judgment, this court's well aware of what the summary judgment standard is. What we've done is presented you facts to show that a reasonable jury could have concluded from the facts that there were no sales being made by the sales representatives here, that the sales that were being accomplished to the chain stores were, in fact, determined by the account managers, the people above the sales reps in this organization. Now, what about, you know, there's this regulation 29, Code of Federal Regulations 541.504, drivers who sell. Yes, sir. Is that applicable here? Our position is yes, sir. The I'm just wondering because you're, as I understand it, your sales reps didn't actually drive the merchandise to the stores. That's right. They just met those trucks and then helped unload them and stock them in the back room and then eventually put them on the shelves. Is that what your people did? Yes, sir. That's correct. But what we're seeing is this regulation is very analogous to what our people did. They didn't actually... Is it necessary for that particular regulation to apply for you to prevail? No, ma'am. We can prevail without looking at that, but that regulation is the closest analogy to what our guys were actually doing. They were restocking... Well, go ahead. They were restocking, placing orders to simply replace what had been sold by the grocery store. The district court and the defendant's position is simply placing those orders is, quote, making sales. Under the regulations, it's a very difficult thing to wean out of the regulations, but what they say is that you have to obtain a commitment for new or additional material in order to, quote, make a sale. And there were no such commitments here. Now, even better, the analogy to the regulation that you cite, a lot of the same activity is going on. They're simply restocking, and the discussion in the regulations is very analogous to what our guys are doing because that regulation says simply restocking and not obtaining a commitment for new or additional things is not making a sale. Is the analytical route you would choose saying that the drivers who sell regulation controls here, or rather that the proper analytical route is to look at the primary duty of the if the court chooses, the drivers who sell regulation and the factors considered under it as a part of the analytical framework to determine primary duty? Yes, Your Honor, it's the latter. The regulation, the drivers who sell... It's not strictly applicable, but the court might look to it as a source of the proper way in which to analyze the job your clients, in fact, do. Is that sort of the... Yes. That's it. It's a close analogy. Yes, ma'am. And the whole framework, the industry that's involved, all of that is essentially the same. It's possible to analyze the case without taking that regulation into account at all, though, isn't it? Yes, ma'am. Yes, ma'am. Where do you think primarily the district judge went wrong here? I think the district judge went wrong because he didn't closely analyze the fact that the commissions that these people made really weren't commissions at all because they had no chance to grow their income. They were restricted in the amount that they sold. I think he was overly impressed with the Christopher decision by the Supreme Court, which in our opinion really is not very analogous at all. That's the pharmaceutical case. That was kind of a sui generis situation where they talked about the term sale being broad and that was because by law the pharmaceutical reps couldn't sell. But they were doing everything they could to persuade the doctor to later prescribe. So the Supreme Court felt that in that situation they had to define it broadly. Frankly, that case is primarily concerned about whether or not deference should be given to the agency interpretation. That's the issue that they addressed first and that's just not an issue. On the commission point, this is a percentage method of determining compensation, but if you view the definition, kind of a loose definition of commission as involving a commission on actual sales, this would not be a commission on sales they made. It would be a calculation based on a lot of different complicated factors, but it all has to do with how much product is moving on and off the shelves. Yes, ma'am. Yes, ma'am. It's not because of their sales efforts that they were able to increase their commission. It really had to do with their customers, the grocery stores, and what was popular with the grocery store's customers. So there was a disconnect there and you're correct. It's really not. What about the independent stores? Well, the independent stores, that's a different issue, Your Honor. But as the evidence is in this case, our plaintiffs dealt the overwhelming majority of their time with the chain stores, so the stores where they had these planograms, they weren't allowed to sell. But yes, the independent stores were a small percentage, 10%. There they were entitled to, they were allowed to work. Is there conflicting evidence as to what percentage the independent stores were, or is that 10% figure the only thing in the record on that? There's some conflicting evidence because the defendant took depositions of about 10 of our clients and the... I don't know that it's conflicting, but for each particular plaintiff, it was different. But it was in the ballpark of 10 to 20%, no more than that, and sometimes down as little as 1%. So your position is that wouldn't determine their primary duty? That's correct, Your Honor. That's correct. They did actually sell to the independents themselves. They had an opportunity to. They said the independents were a small part of their time, a small part of their income. A lot of the independents didn't have room, but yes, they were allowed to do that. But they were working, with regard to Meyer, they were working seven days a week. Their primary time was spent stocking shelves, dusting, doing all the other activities, besides even filling out orders. And it's our position that that was their primary duty, was servicing the stores on behalf of KEHI to make sure that the planograms that KEHI itself and its account managers came up with, that those are complied with and that the shelves were restocked. Did they talk to the managers or anything when they went in, or just go in, stock up the shelves and go out the door? Or is that in the record? They may have said, my time's up, they may have said, the evidence is they said, hello, the store managers had no authority in the chain stores to buy anything. Was that your question, sir? Thank you. All right, Ms. Feingler. Good morning, Cardell Feingler on behalf of KEHI. There are a few issues that I need to get through today, so I will do my best to get through them all. The first one, as plaintiffs just mentioned, I think is the most important. And that is whether the court should affirm the district court's grant of summary judgment to KEHI on plaintiffs' claims that they were improperly classified as outside sales people exempt from the FLSA. Isn't there a factual situation here that needs to be resolved? There is no factual situation that needs to be resolved here, Your Honor. It is clear that there are undisputed facts. There's not a single dispute anywhere in the record as to what the job duties of these sales representatives was. That is undisputed. And throughout plaintiffs' briefs, they talk about there being disputed facts, but they don't actually ever say what those disputed facts are. The real issue for them, then, is the conclusions that the judge drew from the undisputed facts. There's no dispute that these individuals work from their homes. They work outside and away from KEHI's offices. One of their primary duties, which they themselves say, was to write orders for additional product at their customers' locations for later delivery. That's very important, because under the regulations, the fact that they wrote these orders, thereby consummating the sale of KEHI's products, meant that they were... That was in this context, for want of a better way to characterize it, a ministerial task, and that others in the company were the customer development team, the account management teams. Those folks were actually making the sale, i.e., promoting the product, encouraging purchase of the product. There's a couple different questions there, Your Honor. The first one is, no, I don't believe that the fact that there is someone else in the company who's responsible for helping to promote a product, the marketing department, the customer development team, has anything to do with whether or not the plaintiffs here were responsible for making sales. The plaintiffs were not responsible for negotiating the agreement to buy product, were they? They were not responsible for the overall and the overarching environment through which they could sell their product. They were not responsible for that. They were not responsible for approaching the store and saying, would you like to buy product from our company or this particular product? Well, for purposes of summary judgment, Your Honor, we did not dispute that. That is an issue that we would have at some later point, which we don't believe we should get to. Well, right now, the record doesn't show that they had that role. Their role was to go into the store, to walk the aisles, and this goes to your first question, whether this was a ministerial function. It was anything but a ministerial function because it took some of them up to five hours to do this because The only thing I was referring to was the writing of the orders. I understand that. But in order to prepare that order, they had to walk the aisles. Oftentimes, you ask this question of plaintiffs, oftentimes with a grocery manager or with the store manager in order to determine what products needed to be reordered and in what quantities. Was that a sales function? Yes. They're just replenishing product is basically what they're doing. There is no distinction in the regulations between ordering additional product, which is actually what the regulation says, additional. There's a distinction in ordinary English. But there's no distinction in the regulation. Whether there's a distinction in the regulation or not, the regulation doesn't affirmatively obliterate the distinction in ordinary English between ordering and selling, does it? What I think, Your Honor, is that the regulations and the comments that the DOL has made to those regulations has made it very clear that ordering, if you were consummating the sale, that is a sales function. And where Christopher, the Supreme Court decision comes in here Well, okay. Yes. Assuming you're right about that, ascertaining how much product has been purchased, is that a sales function? That is part of the sales function. Restocking shelves is a sales function? That is promotion work that is done in conjunction with their sales function, which is exempt. Meeting a delivery man is a sales function? Putting the promotion work that they were to do in conjunction with the sales that they were responsible for, that is exempt work because it is done in conjunction with their own sales. And what's the best case that supports your argument? I would say there's two cases. One is actually Christopher, because it talks about the broad definition of the word sale and that the Congress did not, in fact, limit that definition in the ways that the plaintiffs are trying. What's your other case? Okay, and my point there is to say it's not just with respect to pharmaceutical sales. That is with respect to the entire definition of the word sale under the Fair Labor Standards Act, which is very important here. The second case is Ackerman, Coca-Cola, a case out of the Tenth Circuit. In that case, there were salespeople, and they called them both sales representatives and also account managers who did functions that were very similar to what the plaintiffs here do. They went to stores. They replenished product. They wrote orders for new product. Not new product, excuse me, additional product. That is an important point because the regulation does say additional, not new. So for more product, they rotated the stock. They, you know, put outdated stock off the shelf and put new stock onto the shelf. Planograms like here? There wasn't a discussion in that particular case as to whether there were planograms, but planograms have existed in the grocery industry for a very long time. This is not something new to the grocery industry. And, in fact, in their depositions, the plaintiffs talked about the fact that planograms are nothing new for these chain stores. Without a planogram, it would be utter chaos. The store needs to know where its products are and where they're going. That's not anything that's unusual here. Are you familiar with our Sixth Circuit case of, what is it, Hodgson v. Clegg's Coal & Ice Company? I am familiar with Hodgson. That involved Coca-Cola and Routman. And in that case, our court held that they were not outside salesmen. In that case, the individuals were drivers who sell, who are very different than outside salespeople who do not drive and deliver product. The regulations are very specific when it comes to what a driver who delivers product has to do in order to qualify as an outside salesperson. That's not this situation. Those are not these people. The other big distinction with Hodgson. Because of the difference that they don't deliver the product directly. They meet the driver. That's what our people do. No, because I believe the DOL was concerned with the fact that one of the primary duties of a driver is to actually drive and deliver the product. That is not the circumstance here. In that circumstance, they wanted to be sure that there were appropriate controls in place so that the distinction between someone who merely drives and delivers can be made between that person and someone who is engaged in sales activities. One of the major points, I believe, that was in Hodgson is that the court actually looked at the fact that the orders that the sales delivery people actually wrote oftentimes were written the night before, so not at the customer's place of business, but were written the night before and then delivered to the warehouse or the people who put the items on the truck. That's a very big distinction because one of the requirements for an outside salesperson is that they perform the sales function at their primary duty at the customer's place of business. And so they didn't do that in that case. They did not do that, by and large. Restocking the Coca-Cola products on shelves at grocery stores, just like sort of what's happening here, isn't it? It's not just restocking. Ordering is a very important function. In the 1949 comments, the 1949 Weiss Report, the DOL actually talked about this very situation. And the DOL said that if you had a situation where a salesperson was in a chain store and that salesperson was the one responsible for writing the orders, that salesperson then consummated the sale for purposes of the outside sales exemption. Not the person who's doing their preliminary work, talking to the store manager to get them to potentially commit to buy the product, but the person who was standing there and actually wrote that order was the person who, in fact, consummated that sale. Is that part of the Code of Federal Regulations? Those are the comments to the Code of Federal Regulations, the 1949 Weiss Report. Comments. Comments, that's correct. So it has a number of scenarios that the Supreme Court and other courts typically look to to delineate these more difficult situations. And one of those scenarios was the one that I just talked about, where, in fact, the company's representative here, the wholesaler or the distributor's representative, was with the manufacturer's representative. The manufacturer's representative was the one who would talk to the store people, try to get them to commit to buy their product. But if that wholesaler's representative was the one who wrote that order, the DOL's comments say that's the person who, quote, consummated the sale for purposes of the outside sales exemption. And it was in furtherance of their own sales, then, that any of the preliminary work was done. I'll have to take a look at this Ackerman case from the 10th, sir. Yes. Yes, that we believe is a very important case. I would also say, Your Honor, that we've scoured the case law here, and we're not aware of a case out there where the salespeople, in fact, wrote the orders, were responsible for walking the aisles and writing those orders and later transmitting those orders, okay, where they were not found to be outside salespeople. They fit all the other indicia of an outside salesperson. They are compensated entirely on commission based on their own sales. Here, in this case, the plaintiffs admit, particularly Plaintiff Basnick, that if the plaintiffs did not consummate the sales at these stores, there would be no revenue, either to CAHI or to the plaintiffs themselves in the forms of commissions. In the commission, I notice there's a 2% commission for stocking, and only one-tenth of 1% commission for writing orders. Yes. Why is that? That doesn't seem consistent with these being salesmen as opposed to restocking people. There was testimony on that issue, Your Honor, from one of CAHI's representatives, and he said that the way that they did this commission plan was not based upon what was most important, but what was the more difficult task to do. Stocking is a more physically demanding task. It would be a more time-consuming task, too. It could be. It could be, although these folks were permitted to hire stockers. So they did not have to do that task if they did not want to. They did not have to do the facing and the dusting. They didn't have to do that if they didn't want to do it. They could have hired. If they want to eat. Well, but that would free them up to do other types of sales activities, if they so chose. That was a choice that they made, and CAHI's commission plan permitted them to do that. I will also say that there is no dispute by the plaintiffs that they were selling for purposes of their independent stores. Well, the commission plan, with the exception of an additional 1% for promotional marketing, was identical for the independent stores. So this distinction that the plaintiffs are trying to make here, that somehow the commission plan, because it's specifically delineated here, sometimes somehow means it is not, in fact, a commission, that is a percentage of the total volume of their own sales, simply doesn't comport with the record or, quite frankly, with. With these chain stores, was there somebody separate who filled out papers and talked to the chain stores, or just these plaintiffs? I beg your pardon, Your Honor? Were these plaintiffs the only people who went to the chain stores, or was there somebody else for their employer who went to the chain stores and filled out papers with them for orders? The plaintiffs were almost exclusively responsible for writing the orders in their stores. But they weren't the ones making the initial sales, were they? They were not the ones who set up the overall sales contract. No, they were not. But that is not uncommon for any industry that is this large. That's not an uncommon thing. There's nothing in, for example, the Supreme Court case that said that one of the indicia of an outside salesperson is whether they get to set the price and negotiate the contract and do all these things, which is not even realistic for some of these multibillion-dollar companies. Of course, there's going to be an overarching distribution contract, and these stores are going to have requirements that need account managers and others to help facilitate that. But that in no way means that the plaintiffs themselves have not consummated the sales, particularly when, if it were not for them, Cahie wouldn't make any money, and that they are compensated only for the sales in their own stores, not Cahie Corporate, their own stores. It's their sales that they have made, and they have made commissions on those sales. My time is up. Mr. Banda. You might mention if you think you can distinguish the Ackerman case that opposing counsel relies on, I'd like to hear it. Yes, sir, very easily. First of all, if you look at the facts of Ackerman, they were selling Coca-Cola. The Ackerman court found that they were exempt outside salesmen because they were persuading the stores to which they were selling to buy more Coke, to buy additional Coke. So that's what convinced the court in that situation. They weren't simply restocking, but they were actively persuading their customers to buy more. And that's the distinction between Ackerman and what we have here. The other situation that I found interesting that we had this discussion with the court about whether or not the driver-salesman regulation has any pertinence to this, you recall that she mentioned that Ackerman was a case that was in her favor. That's an outside driver-salesman situation. So the distinction between Ackerman and what we have here is not only that she, on one hand, says that particular regulation doesn't apply, but in her view it is in her favor in Ackerman. Hodgkin was the same kind of a... Excuse me. Does the court in Ackerman apply and analyze the factors of the drivers-who-sell regulation? Yes, yes. And there it found that there was this persuasion going on, the culmination of a sale that the customers bought more, and that's why they found that they were exempt outside salesmen. Contrary to what happened in Hodgkin, which, again, involved driver-salesmen, there was no persuasion there to buy additional things. They were simply restocking. That's our case. That's the kind of situation that we have here with restocking. As you've noted with regard to the compensation scheme, they view restocking as much more important than what the amount of money was paid for filling out orders. How often did these salesmen who started the business with that particular chain store, did they come back or did they communicate with the store later, or did your clients all come back and fill out orders? Well, Your Honor, I'm not sure I understand the question. The situation is this, that KEHE would have account managers who would persuade, they'd have an account manager for each large chain, and they would set up the planograms, they would determine what the price is and the amount of product on the shelf, and our people, the service reps, would simply come in afterwards, make sure that the shelves looked like that planogram each day. In other words, if there were a lot of product that was purchased, they would make sure it was replenished. So there was communication between the account managers and the chain store buyers in a level far above what our service reps and the managers of that particular store were involved. Does that answer your question or not? Well, I'm just wondering if the store decided they want more or less of some product, whom did they contact? Did they contact your clients or did they contact somebody? No, there's testimony in the depositions. I didn't mean to interrupt, Your Honor, but there was testimony in the depositions that, no, our service reps could not communicate and get more product. The buyers on a level above what the store manager was on the customer side would communicate with the account managers on a level above what our service reps were. So that's the communication that would go if they wanted to change the quantity, if they wanted to change the planogram. Our clients were not able to do that. Would the best way to characterize your clients' responsibility be that they had an inventory management job? Yes, ma'am. Is there anything they were doing in addition to that that we need to take into account? Well, of course. They were dusting. They were rotating products so that it was outdated. They would take it off the shelf. Why wouldn't that be inventory management? Okay, you're right. You're right. It's basically inventory management. You might, in your remaining time, touch on this other issue of the collective action waiver. Yes, sir. I didn't mean to ignore that in my first presentation, but I'd like to stand on our briefs. I think that the most recent decision that this court came out with in 2013, the Ogden case, addresses that you can't, the case law is clear, you can't contract away your Fair Labor Standards Act rights, and we believe the right to a collective action can't be contracted away. The interpretation of the Department of Labor under the Fair Labor Standards Act says that you have a collective action right that cannot be contracted away. There are a bunch of cases from other circuits that say if you waive collective action because you agree to submit to arbitration, the arbitration trumps. That's right, Your Honor, and that's a situation where the courts are trying to balance two competing federal policies, the labor policy and the arbitration policy. That's not this case. There is no arbitration policy, federal arbitration policy at issue here. All you have is the labor policy and a contract that was made up by the employer. Okay? Thank you. Thank you both very much for your argument, and we'll consider the case carefully.